# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JOHN DOE ALF-1, JOHN DOE ALF-2,                    Case No.
& JOHN DOE ALF-3, JOHN DOE ALF-4,
JOHN DOE ALF-5,                                     Hon.

       Plaintiffs,

vs.

THE UNIVERSITY OF MICHIGAN & THE
REGENTS OF THE UNIVERSITY OF
MICHIGAN (in their individual and official
capacities),

       Jointly and Severally,

       Defendants.

---

Andrew P. Abood (P43366)
**ABOOD LAW FIRM**
Attorneys for Plaintiffs,
246 E. Saginaw, St., Suite #100,
East Lansing, MI, 48823,
Phone: 517-332-5900
Fax: 517-332-0700
Email: andrew@aboodlaw.com

Jeffrey Lance Abood (P72607)
**ABOOD LAW FIRM**
Attorneys for Plaintiffs,
470 N Old Woodwars Ave, Suite #250
Birmingham, Michigan 48009
Phone: 248.549.0000
Email: jeff@aboodlaw.com

---

### COMPLAINT AND JURY DEMAND

**NOW COME** Plaintiffs, JOHN DOE ALF-1, JOHN DOE ALF-2, and JOHN DOE ALF-

1

3, JOHN DOE ALF-4, and JOHN DOE ALF-5, by and through their attorneys, Andrew P. Abood and the ABOOD LAW FIRM, and for their *Complaint* against the University of Michigan ("U of M") and the Regents of the University of Michigan ("Regents"), collectively referred to as "Defendants," state as follows:

## I.   INTRODUCTION

1.      U of M employed Dr. Robert Anderson ("Anderson") as a physician by U of M from 1966 until 2003.

2.      While employed at U of M and while acting in his capacity as an employee/agent/representative/fiduciary of U of M, Anderson sexually assaulted, battered, molested, and harassed students, especially student athletes, including Plaintiffs under the guise of medical treatment.

3.      Anderson used his position of trust and authority to abuse students, non-students, and student athletes over the course of his nearly four decade career with U of M.

4.      Based on information and belief, as early as 1968, U of M became aware of Anderson's above-mentioned actions after receiving complaints that Anderson committed sexual assaults during medical examinations.

5.      After receiving additional complaints that Anderson was sexually assaulting students, in 1979 U of M moved Anderson from his position within University Health Services ("UHS").

6.      On information and belief, Instead of terminating/disciplining/investigating Anderson and or reporting his behavior to the proper authorities, U of M moved Anderson to the Athletic Department, where he continued to sexually assault students until his retirement in 2003.

7.     After moving Anderson from UHS, U of M also provided Anderson access to sexually assault students/non-students through the U of M Health System in various positions including at the East Ann Arbor Health Care Facility and to provide clinical instruction at the U of M Medical School.

8.     Anderson's abuse was so prevalent and open that he even earned the nickname "Dr. Drop Your Drawers" among student athletes.

9.     U of M concealed Anderson's past, present, and future sexual abuse of vulnerable students and student athletes from the public for the benefit of U of M and to the detriment of its student body and the community at large.

10.     U of M's placement of Anderson into the Athletic Department, gave him access to a continuous supply of vulnerable students, including Plaintiffs.

11.     Student athletes were encouraged to see Anderson for physicals and other medical treatments related to their collegiate athletic careers/eligibility and overall physical health.

12.     Plaintiffs relied on U of M and its representations as a provider of world class medical care ("the Michigan Difference") when they sought treatment from Dr. Anderson, an employee/agent/representative/fiduciary of U of M.

13.     U of M had direct knowledge of Dr. Anderson's sexual assaults and turned a blind eye to them resulting in direct harm to Plaintiffs.

14.     U of M is responsible for the Plaintiffs' damages resulting from Dr. Anderson's sexual assaults, abuse, harassment, battery, molestation, and nonconsensual touching.

15.     This is a civil action against U of M and Regents for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiffs as a result of Defendants acts and omissions in their official capacity and their respective employees, representatives, and

agents relating to sexual assault, abuse, harassment, battery, molestation, and nonconsensual touching against Plaintiffs.

16.     Plaintiffs file this case anonymously and under pseudonyms because it is a case involving sensitive matters including sexual assault and the lawsuit will require disclosure of information of the utmost intimacy. Plaintiffs are entitled to protect their identities by not disclosing their names in this public filing. *Doe v. Porter*, 360 F.3d 558, 560 (6th Circuit 2004), citing *Doe v. Stegall*, 653 F.2d 180, 185-86 (5th Cir. 1981).

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this is a civil action arising from the Constitution, laws, and treaties of the United States, including but not limited to, Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*., and the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

18.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1343 as this is a civil action authorized by law brought by a person to redress the deprivation, under color of a State Law, statute, ordinance, regulation, custom or usage, of a right, privilege or immunity secured by the Constitution of the United States or by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and a civil action to recover damages or to secure equitable relief under an Act of Congress providing for the protection of civil rights.

19.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

20.     The claims are cognizable under the United States Constitution, U.S.C. § 1983, 20

4

U.S.C. § 1681 *et seq.*, and under Michigan Law.

21.     The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

22.     The events giving rise to this lawsuit occurred in Washtenaw County, in the State of Michigan, which is located in the Southern Division of the Eastern District of Michigan.

23.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the United States District Court for the Eastern District of Michigan, as this is the district in which the events giving rise to the claims in this Complaint occurred.

24.     Plaintiff's Complaint is timely filed within the applicable statutes of limitations and under M.C.L. § 600.6431(3).

### III.    PARTIES

25.     Plaintiff John Doe ALF-1 is a resident of the State of Michigan.

26.     Plaintiff John Doe ALF-2 is a resident of the State of Michigan.

27.     Plaintiff John Doe ALF-3 is a resident of the State of South Carolina.

28.     Plaintiff John Doe ALF-4 is a resident of the State of Michigan.

29.     Plaintiff John Doe-ALF-5 is a resident of the State of Michigan.

30.     Defendant U of M is a public university organized and existing under the laws of the State of Michigan.

31.     U of M receives federal financial assistance and therefore is subject to Title IX of the Education Amendments of 1972 20 U.S.C. § 1681(a).

32.     Defendant Regents of the University of Michigan is a body corporate, with the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

33.     Regents are responsible for governing the University of Michigan as a whole including, but not limited to UHS, the U of M Health System, and the Athletic Department.

34. Defendants are not immune from suit under the Governmental Tort Liability Act, M.C.L. § 691.1401, *et seq*., sovereign immunity, or any other statute or Michigan or United States constitutional provision.

## IV. COMMON FACTUAL ALLEGATIONS

35. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-34 above as if stated herein.

36. From 1966-2003 Anderson was employed as a physician treating students, non-students, and student athletes on U of M's campus.

37. U of M provided Anderson with a pool of vulnerable young men for Anderson to treat with impunity through U of M's health system and Athletic Department.

38. On information and belief, U of M hired Anderson in September of 1966 where he held a position within UHS giving medical care to student athletes, students, and non-students.

39. It was sometime soon after beginning employment with U of M that, according to Ambassador Ron Weiser, current chair of the U of M Board of Regents, Anderson abused Ambassador Weiser while Weiser was a freshman wrestler at U of M.

40. On or about October 1, 1968, UM promoted Anderson to UHS Director, and Anderson continued as the Athletic Department's primary care physician and team physician for U of M's athletic teams.

41. In 1968 or 1969, a U of M undergraduate student (hereinafter "Student 1"), went for an examination with Anderson, that he later described to *The Detroit News* as "very traumatic" and during which he stated that, "he (Anderson) had me drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis

and genitals.

42.     Student 1 further stated that "[b]ack then you did not question a doctor's authority … he asked me to pull on his penis."

43.     Student 1 filed a written complaint with UHS, detailing that Anderson had dropped his pants and asked Student 1 to fondle his genitals.

44.     Despite this significant red flag, no one from U of M followed up with Student 1 and no one investigated the complaint against Anderson.

45.     On information and belief, U of M never investigated or took any action regarding Student 1's complaint.

46.     In 1973, Anderson fondled the genitals of another undergraduate man to the point of ejaculation. The student, reported this incident in 1994 to the predecessor of Michigan's Department of Licensing and Regulatory Affairs.

47.     On information and belief, in the ordinary course of a reported sexual assault by a regulated professional, LARA would have contacted U of M as Anderson's employer. However, U of M failed to take action and continued to employ Anderson until he voluntarily retired in 2003.

48.     In 1975, Bill Johannesen who was then U of M's wrestling coach, admitted that when one of his wrestlers went to Anderson they had to "drop their drawers" even if the injury was to the wrestler's elbow.

49.     A scholarship athlete on U of M's wrestling team in 1975 ("Student 2"), gave notice of Anderson's sexual misconduct in a 10-page letter to Coach Johannesen, complaining that "Something was wrong with Anderson, regardless of what you are there for, he *insists* that you 'drop your drawers and cough".

50.     Neither U of M, Coach Johannesen, nor any agents of U of M investigated Student 2's complaints about Anderson's sexual assaults and instead Coach Johannesen revoked Student 2's athletic scholarship.

51.     Student 2 appealed to Don Canham, the Athletic Director at the time, giving the Athletic Director notice of the allgations against Anderson, but Canham refused to take action/investigate the complaints against Anderson and upheld the wrestling coach's decision to pull Student 2's athletic scholarship.

52.     Student 2 hired an attorney and appealed to U of M's Board of Intercollegiate Athletics to get his scholarship returned.

53.     On information and belief the above-mentioned Board, found Student 2 to be credible and yet U of M still did nothing to prevent Anderson's sexual abuse.

54.     Another male student, ("Student 3"), who attended U of M in the 1970's, filed a complaint in Case 2:20-cv-10622-VAR-EAS, alleging that Anderson repeatedly groped this student's penis and testicles, and digitally penetrated his anus during approximately 25 visits to Anderson for a variety of illnesses and injuries.

55.     In 1976, Student 3 approached the track coach as well as the assistant track coach and informed them about Anderson groping him during medical exams (he was too embarrassed to speak out about the digital penetration at the time).

56.     Student 3 requested that he be allowed to see another physician, but were laughed off by the track coaches, who refused his request.

57.     This indifference to Anderson's actions by coaches and individuals in positions of authority at the University of Michigan normalized Anderson's behavior.

58.     The track team had started calling Anderson "the pants down doctor" around this

time.

59.    According to records from the Washtenaw County Prosecutor's Office, in 1979, a then-graduate student at U of M ("Student 4") was seen by Anderson at UHS and reported that Anderson "gave undue attention to my genitals and rectal area. It was very physically and socially uncomfortable . . . he inserted his finger into my rectum for a period that was longer than any other hernia or rectal evaluation."

60.    Student 4 complained at UHS to the desk clerk and an administrator who both "dismissed" his complaints and had security escort Student 4 from the UHS premises.

61.    Once again, with Student 4, U of M had an opportunity to do the right thing and at the very least investigate Anderson's activities, but failed to do so.

62.    In 1979, Anderson assaulted a Student Life employee/gay rights activist at the University by digitally penetrating him and after the employee reacted in pain Anderson stated, "I thought you would have enjoyed that!"

63.    The employee told his superior and then Vice President of Student Life at U of M, Tom Easthope, that Anderson had assaulted multiple members of the gay community at the school.

64.    Easthope did some investigating into the incident and later met with the employee where he told him that he spoke with Dr. Anderson and that "He (Anderson) does not deny your allegations against him", Easthope also stated that, "Dr. Anderson is troubled, sick, and needing help...he's very sorry for any distress or upset he caused you."

65.    Vice President Easthope, who had oversight of UHS, believed the employee's account that Anderson was sexually assaulting patients and terminated Anderson despite his hesitation due to Anderson's status as a "big shot" at the University.

66.     After terminating Anderson, Easthope allowed Anderson the privilege of resigning his position with UHS to avoid a dispute, that could have prolonged Anderson's departure from UHS.

67.     Unfortunately, according to U of M human resource records, Anderson was not actually terminated, but "demoted" effective January 14, 1980 and U of M continued to employ Anderson in positions where he had access to vulnerable patients.

68.     Easthope was recently confronted about Anderson and claimed he was unaware that U of M continued to employ Anderson as a physician after 1979 and stated that "I bet there are over 100 people that could be on that list (of young men abused by Anderson)."

69.     Longtime U of M athletic trainer Russell Miller, believes powerful Athletic Director Canham, a legend at U of M, "worked out a deal" to allow Anderson to continue to work for U of M in the Athletic Department, where he continued to sexually assault patients.

70.     Despite his "termination" from UHS, U of M allowed Anderson to treat patients within UHS until at least 1981, where he continued to molest and sexually assault students.

71.     Anderson was considered to be a highly regarded physician at U of M during his multi-decade career and was praised by Athletic Directors, trainers, and coaches. One longtime coach of the U of M football coaching staff during the 1980s, 1990s, and 2000s called Anderson "a tremendous asset."

72.     In 1980, Anderson told the Ann Arbor News that Athletic Director Canham created a brand-new position for him as the "formal team physician". Please See the Ann Arbor News, June 10, 1999, pg. B7.

73.     Despite being well aware of Anderson's actions, U of M fraudulently and egregiously concealed Anderson's behavior.

74.     Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980 stated: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine...his many contributions to health care are acknowledged...The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him."

75.     As noted above, U of M continued to praise Anderson and his termination was changed to a "demotion" in his University human resources file, despite the numerous and increasing amount of abhorrent complaints against him, so he could remain a physician within the University in some capacity.

76.     While under the protection U of M's leadership, Anderson used his new position within the Athletic Department to abuse hundreds of U of M male athletes including Plaintiffs.

77.     After the demotion to the Athletic Department, U of M continued to tout Anderson as a superstar physician and he was praised by authority figures within the University including Athletic Director Canham.

78.     Dr. Anderson was a powerful figure within the Athletic Department and the University as a whole. He not only eluded his "termination" in 1979, but Anderson travelled with the school's heralded football team on the road, was often seen prominently standing on the sidelines with the team during football games, and Anderson received VIP treatment for the football team's end of the year bowl games.

79.     U of M derives substantial revenue from its athletic programs, especially the historically successful football team, and a scandal involving its team doctor would have

undoubtedly tarnished the school's reputation.

80.    Outside of his position within the Athletic Department, Anderson operated a private practice and worked as a physician at U of M's East Ann Arbor Health Care facility where he also sexually assaulted patients.

81.    In 1993 U of M acquired Anderson's private practice, another sign of the unprecedented support and influence Anderson had at the school.

82.    Anderson remained with U of M as a clinical instructor at the U of M Internal Medicine Department until his retirement in 2003.

83.    In summation: U of M, at the very least, received complaints/warnings from students that Anderson was a sexual predator in 1968, 1975 and 1976 respectively. A graduate student then complained to U of M about Anderson in 1979 and an activist/employee with Student Life informed U of M that Anderson was sexually abusing gay students in 1979. U of M acknowledged Anderson was a sexual predator in 1979 and then "fired" Anderson, but instead of actually firing him, Anderson was simply moved to a position in the Athletic Department where he was given inconceivable access to scores of victims and where his actions and the allegations against him were actively hidden from the public.

84.    Over the course of nearly 4 decades, complaints about Anderson's sexual abuse fell on deaf ears at U of M and U of M repeatedly failed to act to protect its students and the public at large from Anderson.

85.    At all relevant times Anderson maintained an office in Ann Arbor, Michigan and held himself out as a representative/agent/employee/and or affiliate/etc. of U of M.

86.    At all relevant times, including from 1966-2003, Anderson was acting within the course and scope of his employment/agency with U of M.

87.    At all relevant times Athletic Director Don Canham, various coaches, and others were acting within the course and scope of their employment/agency with U of M.

88.    Anderson in his capacity as a physician for U of M, acted as a primary care physician for students, non-students, and student athletes including Plaintiffs, who saw him for a litany of reasons ranging from cold and flu issues to broken bones.

89.    U of M took no action to investigate the above-mentioned complaints from students and provided Anderson access to sexually assault patients with impunity.

90.    U of M failed to take corrective action against Anderson even after Easthope tried firing him in 1979, causing severe trauma and damages to victims of Anderson for decades as a result of his sexual abuse during "medical examination".

91.    Young students who saw Anderson were needlessly exposed to a sexual predator who would sexually assault, molest, and abuse patients via nonconsensual sexual touching and nonconsensual digital anal penetration.

92.    Young males abused by Anderson were led to believe by those with authority, including many in U of M's administration and Anderson himself that the medical "treatments" they received were necessary, when in reality they were performed by Anderson to satisfy his sexual desires.

93.    Despite how uncomfortable the young victims were with Anderson, they did not appreciate the extent of the abuse at the time as it was normalized and downplayed by many within U of M's community.

94.    Many student athlete victims faced under immense pressure to perform, which included healing quickly from injury so they could return to their field of play as quickly as possible, which usually meant seeing Anderson, the Athletic Departments "superstar".

95.     U of M failed to act to protect its student body and the community at large despite having knowledge of Anderson's sexual abuse during medical examinations.

96.     Because of U of M's failure to take action even with knowledge of Anderson's abuse, Plaintiffs were sexually assaulted, abused, battered, and molested by Anderson.

97.     As early as 1968, U of M had notice of Anderson's sexual abuse, and Plaintiffs' assaults could have/would have been prevented had U of M acted on and/or investigated any of the numerous complaints against Anderson.

98.     Plaintiffs' assaults could have and would have also been prevented if Defendants actually fired Anderson in 1979 instead of moving him to the Athletic Department and had U of M provided information to Plaintiffs or their parents regarding the numerous allegations against Anderson, wherefore Plaintiffs would have likely seen a different physician.

99.     U of M facilitated Plaintiffs' abuse from Anderson, by failing to act and failing to warn them about allegations of Anderson's sexual abuse, and failing to supervise Anderson even after U of M received credible complaints of his sexual abuse.

100.    Anderson abused Plaintiffs at his office(s) within U of M and under the guise of medical treatment.

101.    More recently, with allegations and complaints about Anderson coming to light, U of M continued to repeat its pattern of mishandling these allegations as it stalled its disclosure of these incidents to the public and its former students for 19 long months.

102.    On July 18, 2018, Student 2 sent a letter to current Athletic Director Warde Manuel, notifying him of Anderson's sexual assaults against him when he was a student from 1972-76, he notified former Athletic Director Don Canham of the same in the 1970's.

103.    On information and belief, U of M requested its campus police department to

14

begin a non-public investigation in response to Student 2's letter to Athletic Director Manuel, but it took no further action to address/notify former students and/or the public about the allegations, Anderson's lengthy history of sexual abuse of U of M's students, and/or its investigation until compelled to do so by *The Detroit News* 19 months later.

104.    U of M President Schlissel admitted on February 20, 2020, "Our (U of M) police found indications that U of M staff members were aware of rumors and allegations of misconduct during Anderson's medical exams."

105.    At least one of U of M's Board of Regents, Regent Ron Weiser, had personal knowledge that Student 2's allegations of sexual assault in the July 2018 letter were true.

106.    Another member of the U of M Board of Regents, Regent Paul Brown, recently stated publicly that Anderson also sexually assaulted three members of his family when they were students at U of M.

107.    For several years, Defendants have been under intense media, public, legal, and governmental scrutiny regarding their mishandling of sexual harassment and sexual assaults committed by faculty members, including, but not limited to Professor David Daniels; several Title IX complaints by students in recent years; and complaints of sexual misconduct and inappropriate behavior against Provost Martin Philbert.

108.    Defendants' 19 month delay in notifying the public and alumni about Anderson's abuse of students is consistent with the pattern of U of M's recent reactions to sexual abuse allegations mentioned above.

109.    Plaintiffs were sexually abused, assaulted, harassed, and molested during medical examinations by Anderson in a number of ways including, but not limited to: anal penetration, groping and manipulation of their genitals without consent, unwated and non-consensual

touching of genitals for prolonged periods of time, inappropriate sexual remarks, lewd sexual comments including comments about endowment and sexual performance, inappropriate cupping of testicals, unwanted sexual touching, digital penetration, attempted digital penetration.

110.    Each of the above mentioned actions of Anderson against Plaintiffs were not done for a medical purpose, but for Anderson's own sexual pleasure.

111.    Plaintiffs relied on U of M and its agents/employees/administrators etc., who pushed/encouraged them to treat with Anderson through UHS and the U of M Health System and Athletic Department.

112.    Plaintiffs chose to attend U of M for their academic/athletic careers in part due to its national reputations as "the leaders and the best", as stated in the schools fight song and echoed by alumni and fans of the University.

113.    U of M offered Plaintiffs affordable and or free healthcare through their paid tuition/scholarships, which made Anderson's services cost effective and readily available.

114.    Plaintiffs trusted U of M and their agents, representatives, administrators, and employees who encouraged them to seek healthcare and treatment through UHS and the U of M Health System and touted Anderson as an exceptional doctor.

115.    Plaintiffs never saw Anderson for injuries to their genitals or anus and at no point complained about issues with those body parts.

116.    Plaintiffs were ignorant to the fact that Anderson's treatments were for his own criminal sexual intentions and that U of M knew of Anderson's behavior/actions and intentionally and wantonly gave a sexual predator access to abuse Plaintiffs and other male patients.

117.    Anderson's sexual abuse took place on U of M property and on campus and

Plaintiffs trusted that the medical examinations they received through U of M by Anderson were legitimate and necessary medical examinations for the purpose of treatment/diagnosis.

118.    Plaintiffs also trusted Anderson as a medical professional and authority figure within U of M.

119.    As U of M students, Plaintiffs had no medical training or experience and were not aware that Anderson's treatment was actually sexual assault, abuse, and molestation.

120.    Plaintiffs experienced shame, embarrassment, and discomfort in processing their assaults at the hands of Anderson under the guise of medical treatment and feared coming forward about their experiences until recently.

121.    Plaintiffs developed an inherent distrust of doctors and medical professionals after Anderson's assaults.

## V.  PLAINTIFFS' SPECIFIC FACTUAL ALLEGATIONS

122.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-121 above as if stated herein.

**A.  John Doe ALF-1.**

123.    Plaintiff John Doe ALF-1 is a 56-year-old resident of Michigan.

124.    Plaintiff John Doe ALF-1 attended the University of Michigan from 1982-1986.

125.    Plaintiff John Doe ALF-1 saw Anderson at least four times during 1982-1986 for a range of issues including physicals and a sprained ankle.

126.    Anderson sexually assaulted Plaintiff John Doe ALF-1 on campus during medical examinations by penetratiting John Doe ALF-1's anus, fondling his genitals, with significant groping of the testicle area and other non-consensual sexual touching.

127.    The "exams" conducted by Anderson on Plaintiff John Doe ALF-1 went well

beyond the typical genital check one may experience during a physical and delved into sexual harassment and assault.

128.   Plaintiff John Doe ALF-1 recalls that these "strange" physicals were a running joke around campus.

129.   As a result of Anderson's sexual assault, Plaintiff John Doe ALF-1 experienced significant damages and severe trauma that detrimentally impacted Plaintiff John Doe ALF-1's life on a day-to-day basis.

130.   The damages to Plaintiff John Doe ALF-1 include, but are not limited to pain and suffering, embarrassment, loss of quality of life, loss of self esteem, humiliation, and emotional distress, which physically manifested into alcoholism, sexual problems, and anxiety throughout Plaintiff John Doe ALF-1's life.

131.   Plaintiff John Doe ALF-1's damages were directly and proximately caused by Defendants' actions/inactions stated above.

132.   As Anderson's deplorable actions have recently come to light and its become clear that Defendants actively concealed information about Anderson from the public and kept Anderson employed despite knowledge that he was a sexual predator, Plaintiff John Doe ALF-1 has suffered additional damages including, but not limited to renewed shock, embarrassment, and anxiety.

**B.  Plaintiff John Doe ALF-2.**

133.   Plaintiff John Doe ALF-2 is a 56-year-old Michigan resident.

134.   Plaintiff John Doe ALF-2 attended U of M from 1982 to 1986 and was a varsity athlete at U of M during that time.

135.   As a student athlete on campus in the 1980's, John Doe ALF-2 saw Anderson on at

least four occasions for physicals and medical exams.

136.   Said medical examinations took place on campus at the "Football Building".

137.   During each meeting with Anderson, Plaintiff John Doe ALF-2 was sexually assaulted and molested by Anderson in the form of penetration and non-consensual sexual touching under the guise of a "medical examination".

138.   As a result of Anderson's sexual assaults, Plaintiff John Doe ALF-2 experienced significant damages including, but not limited to pain and suffering, embarrassment, loss of quality of life, loss of self-esteem, humiliation, and emotional distress.

139.   Plaintiff John Doe ALF-2's damages were directly and proximately caused by Defendants' actions/inactions stated above.

140.   As Anderson's deplorable actions have recently come to light and its become clear that Defendants actively concealed information about Anderson from the public and kept him employed despite knowledge that Anderson was a sexual predator, Plaintiff John Doe ALF-2 has suffered additional damages including, but not limited to renewed shock, embarrassment, and anxiety.

**C.  Plaintiff John Doe ALF-3.**

141.   Plaintiff John Doe ALF-3 is a 55-year-old male and resident of South Carolina.

142.   Plaintiff John Doe ALF-3 was a student and a U of M varisty athlete  from 1983-1987.

143.   During this time as a student athlete on campus, John Doe ALF-3 saw Anderson for multiple physicals and medical exams.

144.   These medical examinations took place at the football administrative building that Plaintiff John Doe ALF-3 knew as "Bo's Office", referring to former football coach Bo

Schembechler.

145.    During these physicals John Doe ALF-3 recalls receiving "hernia tests" that included anal penetration and other prolonged and unwanted sexual touching including significant manipulation of the testicles.

146.    Members of the John Doe ALF-3's varsity team referred to Anderson as "Dr. Cup", because of his "weird" habit of cupping and manipulating student athlete genitalia.

147.    Since Plaintiff John Doe ALF-3 was sexually assaulted by Anderson on U of M's campus, Plaintiff John Doe ALF-3 has since avoided going to the doctor as much as possible and prefers/has seen female doctors when he's able to bring himself to undergo a doctor visit.

148.    The damages to Plaintiff John Doe ALF-3 include, but are not limited to pain and suffering, embarrassment, loss of quality of life, loss of self esteem, humiliation, and emotional distress.

149.    Plaintiff John Doe ALF-3's damages were directly and proximately caused by Defendants' actions/inactions stated above.

150.    As Anderson's deplorable actions have recently come to light and its become clear that Defendants actively concealed information about Anderson from the public and kept him employed despite knowledge that Anderson was a sexual predator, Plaintiff John Doe ALF-3 has suffered additional damages including, but not limited to renewed shock, embarrassment, and anxiety.

**D.  Plaintiff John Doe ALF-4.**

151.    Plaintiff John Doe ALF-4 is a 57 year old resident of Dewitt, Michigan.

152.    Plaintiff John Doe ALF-4 was a student and a Division 1 varsity athlete competing for U of M.

153.  During his time as a student-athlete, John Doe ALF-4 met with Anderson for multiple medical exams on U of M's campus.

154.  During said visits, John Doe ALF-4 was sexually assaulted by Anderson under the guise of medical treatment including genital manipulation and groping as well as attempted/potential digital pentration.

155.  On one occasion as a student-athlete, John Doe ALF-4, recalls that he saw Anderson for a routine examination when Anderson placed both hands on his testicals and attempted to move his hands towards his rectum before Plaintiff John Doe ALF-4 jerked away in fear/discomfort.

156.  On another occasion, Plaintiff John Doe ALF-4 saw Anderson for a rash when Anderson grabbed and held onto his genitalia to observe the rash, even though the rash was observable without grabbing and/or manipulating Plaintiff John Doe ALF-4's genitals.

157.  As a student-athlete at U of M, Plaintiff John Doe ALF-4 developed a hemmerhoid, but due to the above experiences with Anderson, he was refused to treat with Anderson, which led Plaintiff John Doe ALF-4 to suffer unnecessary complications from the hemmerhoid including thrombosis and bursting of the hemmerhoid.

158.  The damages to Plaintiff John Doe ALF-4 include, but are not limited to pain and suffering, embarrassment, loss of quality of life, loss of self esteem, humiliation, and emotional distress.

159.  Plaintiff John Doe ALF-4's grandfather passed  away due to gastrointestinal related cancer, but Plaintiff John Doe ALF-4 cannot bring himself to get a much needed prostate examination or colonoscopy.

160.   Plaintiff John Doe ALF-4's damages were directly and proximately caused by

Defendants' actions/inactions stated above.

161.    As Anderson's deplorable actions have recently come to light and its become clear that Defendants actively concealed information about Anderson from the public and kept him employed despite knowledge that Anderson was a sexual predator, Plaintiff John Doe ALF-4 has suffered additional damages including, but not limited to renewed shock, embarrassment, and anxiety.

**E.  Plaintiff John Doe ALF-5.**

162.    Plaintiff John Doe ALF-5 is a resident of Ann Arbor, Michigan.

163.    Plaintiff John Doe ALF-5 was a varisty member of a Division 1 U of M team from 1991-1995.

164.    As a student athlete on campus in the 1990's, John Doe ALF-5 saw Anderson on at least five occasions for physicals/medical exams.

165.    During at least four meetings with Anderson on U of M's campus, John Doe ALF-5 was sexually assaulted by Anderson through groping and genital manipulation without consent and without any medical necessity.

166.    During each visit with Anderson, John Doe ALF-5 experienced sexual abuse in the form of inappropriate sexual remarks from Anderson during the exams including comments on John Doe ALF-5's endowment, sexual abilities, and pleasing the opposite sex.

167.    John Doe ALF-5 is still coming to terms with the abuse he suffered at the hands of Anderson and how its impacted his life and certain choices he made.

168.    The damages to Plaintiff John Doe ALF-5 include, but are not limited to pain and suffering, embarrassment, loss of quality of life, loss of self esteem, humiliation, and emotional distress.

169.    Plaintiff John Doe ALF-5's damages were directly and proximately caused by Defendants' actions/inactions stated above.

170.    As Anderson's deplorable actions have recently come to light and its become clear that Defendants actively concealed information about Anderson from the public and kept him employed despite knowledge that Anderson was a sexual predator, Plaintiff John Doe ALF-5 has suffered additional damages including, but not limited to renewed shock, embarrassment, and anxiety.

## VI.    FRAUDULENT CONCEALMENT

171.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-170 above as if stated herein.

172.    MCL § 600.5855 tolls the statute of limitations for the claims contained in this Complaint and states in relevant part that:

> "If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations"

173.    Defendants through their employees, agents, representatives, as well as Anderson himself fraudulently concealed the existence of Plaintiffs' claims by: (1) concealing from Plaintiffs that the medical examinations conducted by Anderson were actually sexual abuse/assault/molestation, (2) concealing from Plaintiffs that Defendants had knowledge of Andersons sexual abuse and did nothing to prevent it, (3) telling Plaintiffs their procedures were normal and necessary, (4) publishing a statement that Anderson was a trustworthy and renowned

doctor in a publication delivered to and read by university students, and (5) concealing from Plaintiffs that U of M was aware of Anderson's abuse since at least 1968, thereby concealing U of M's identity as a "person who is liable for the claim," as set forth below:

174.   Anderson made the following affirmative representations to Plaintiffs:

    a. Anderson's actions including, but not limited to, genital groping/manipulation and digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

    b. Anderson was not sexually assaulting Plaintiffs;

    c. Anderson's actions including genital groping/manipulation and digital anal penetrations were necessary and proper medical treatments even though many patients, including Plaintiffs, were healthy males between the ages of 17 and 25, with no reported issues related to genitals and/or anus;

    d. Plaintiffs should not question and/or report Anderson to authorities;

    e. Defendants through their employees, agents, representatives were aware of Anderson's conduct and continued to unnecessarily subject Plaintiffs to Anderson's perverted examinations and believed such examinations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial; and

    f. There was no possible cause of action against Anderson and/or Defendants.

175.   Anderson's representations were false; and U of M's Public Safety Department recently investigated medical professional contact, which established that extended genital examinations and digital anal penetrations are almost never needed for any medical treatment of any issues normally experienced by college students.

176.   Anderson knew the above-mentioned representations were false. He engaged in the sexual assaults for his own sexual gratification and/or pleasure.

177.   Anderson knew genital examinations and digital anal penetrations were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty, particularly as the patients including Plaintiffs were healthy college aged men.

178.   Anderson's representations were material, in that Plaintiffs would have stopped treating with Anderson had they known Anderson's representations were false.

179.   Anderson's representations were made with the intent of inducing reliance from Plaintiffs as Anderson sought to continue sexually assaulting Plaintiffs and others as evidenced by the fact that Anderson did, in fact, continue sexually assaulting Plaintiffs and others while employed by U of M.

180.   Anderson's representations were also made with the intent of concealing from Plaintiffs that they had a cause of action against U of M/Anderson.

181.   Plaintiffs did, in fact, rely on Anderson's representations, which led them to continue treating with Anderson, however had they known Anderson's above-mentioned representations were false, Plaintiffs would not have treated with Anderson.

182.   Anderson knew that Plaintiffs were susceptible, and Plaintiffs were in fact, especially susceptible to believing Anderson's misrepresentations because:

   a.  Plaintiffs were young and naïve men when they were abused by Anderson;

   b.  Plaintiffs had no prior experience with genital/anal examinations and therefore it was impossible for them to determine whether the treatment received was sexual assault or a legitimate/proper medical treatment;

   c.  Anderson's representations were reinforced by his support/statements made from U of M representatives that Anderson was a trustworthy and reputable physician who was not to be questioned;

   d.  Anderson's representations were made within the scope of a pervasive culture at U of M's representatives of downplaying and normalizing Anderson's behavior;

e.   Plaintiffs were ignorant to Anderson's sexual assaults as there were no other medical professionals, parents, guardians, caregivers, or others in the room to observe Anderson and question his actions/discover that his treatments were actually sexually abusive and this concealment from other adults/professionals deprived them of the opportunity for Plaintiffs to realize they had been sexually assaulted and had a cause of action;

f.   According to neuroscientists, the prefrontal cortex of the brain, used to distinguish right from wrong and make decisions, is not fully developed until 25 years of age;

g.   Plaintiffs were intimidated by Anderson's reputations and notoriety within the U of M community;

h.   Plaintiffs also trusted Anderson due to his position within U of M and his notoriety and reputation;

i.   Plaintiffs relied on U of M's statements that Anderson was a legitimate and trustworthy medical professional;

j.   Plaintiffs were unaware and had no reason to believe they could potentially sue or had a cause of action because of their young ages, lack of knowledge of the civil justice system and applicable remedies at law;

k.   U of M concealed allegations of Anderson's abuse from other students and the public at large and Plaintiffs were therefore unaware of other students coming forward with allegations and had no reason to believe they had a possible lawsuit or cause of action;

l.   Plaintiffs had not previously heard about allegations in the media regarding sexual assaults/abuse by Anderson, as no such reports existed; and

m.   Plaintiffs were never told by Anderson that his actions during medical examinations were sexual in nature, unlike other victims of sexual abuse who are sometimes informed by their abusers that the conduct is sexual in nature and to not tell parents/others.

183.   Accordingly, Plaintiffs did not know and could not have reasonably known, and were reasonably unaware that a they had possible cause of action against Anderson and/or U of

M until they read an article published on or about February 19, 2020, regarding a complaint filed with U of M's Police Department by a student abused by Anderson, at which point Plaintiffs became aware they too were victims of Anderson's sexual abuse and that U of M indirectly/directly caused the abuse as they had knowledge that Anderson was a sexual predator and failed to protect their students.

184. Anderson, as a physician who Plaintiffs trusted with their care, also breached a fiduciary duty owed to Plaintiffs and therefore his failure to disclose material information was fraudulent.

185. Anderson further concealed the fraud by affirmative acts designed and/or planned prevent inquiry, so that he and Defendants would escape investigation, in that he:

a. Prevented other medical professionals, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs when he sexually assaulted Plaintiffs; and

b. Did not abide by or follow the standard of care which requires another medical professional, parent, coach, trainer, guardian, and/or caregiver be in the room during the examination and treatment of patients.

186. Anderson's representations caused Plaintiffs' injuries/damages related to (1) sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assaults on or about February 19, 2020; and (3) discovering Plaintiffs' beloved alma mater, U of M, that they devoted their life to, in many respects, betrayed them by placing them in the care of a known sexual predator.

187. Plaintiffs incorporate, by reference, the paragraphs above and below regarding damages suffered by Plaintiffs as a result of U of M's responsibility for Anderson's sexual assaults, U of M's awareness and responsibility for Anderson's fraudulent misrepresentations about the sexual assaults, and/or U of M's own fraudulent misrepresentations.

188.  Anderson committed Fraudulent Concealment by concealing fraud with affirmative acts designed and/or planned to prevent inquiry, so that he and Defendants would escape investigation.

189.  At all times pertinent to this action, Anderson was an agent, apparent agent, servant, and employee of U of M and operated within the scope of his employment, and his negligence is imputed to U of M.

190.  Plaintiffs were free of any contributory negligence at all times pertinent to this action.

191.  Defendants, through their employees, agents, and representatives, also made affirmative representations to Plaintiffs including, but not limited to the following:

    a.  Anderson was a trustworthy and celebrated doctor within U of M's highly touted Health Care System as evidenced by their statements in Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980, which stated: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine...his many contributions to health care are acknowledged...The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him.";

    b.  Anderson was to be trusted and not questioned, as his services were worthy of recognition by U of M dedicating the aforementioned "Annual Report to him," even though U of M and its executives knew that Easthope had fired Anderson for his wrongful sexual conduct toward male students;

    c.  Anderson's genital groping and digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

    d.  Anderson's genital groping and digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, and

are such when the patient is a healthy male between the ages of 17 and 25, with no reported issues related to genitals and/or anus;

e.  Plaintiff's were required to be subjected to Anderson's treatments, as they were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

f.  Anderson would treat their ailments and injuries in an ethical and competent manner, and therefore in a non-criminal manner;

g.  Anderson was not sexually assaulting Plaintiffs;

h.  Plaintiffs should not question and/or report the conduct to appropriate authorities;

i.  These affirmative representations were reasserted each time Defendants sent a student to Anderson for treatment. Each such referal was thus an affirmative representation that Anderson was competent, ethical, and respectful of his students, and would otherwise "do no harm" to them; and

j.  There was no possible cause of action against Anderson and/or U of M.

192.  Defendants' representations were false. The U of M's Public Safety Department's recent investigation involving contact with medical professionals established that such genital examinations and digital, anal penetrations are almost never necessary for any physical and/or medical treatment of any other issues typically experienced by college students.

193.  Defendants' knew these representations were false, as they received several complaints regarding Anderson's sexual assaults since at least, 1968, which was prior to Plaintiffs arriving on campus. Defendants also removed Anderson from his position as UHS Director in 1979 due to these allegations of sexual assault, thus showing U of M had knowledge the representations were false.

194.  Defendants made the material representations knowing they were false, or made such representations recklessly, without any knowledge of their truth, and in a positive assertion,

despite having previously received similar complaints of Anderson's abuse from other students, and thus knew Anderson's gential examinations and digital, anal penetrations had been questioned in the past.

195.   Defendants' representations were material, so much so that had Plaintiffs known the representations were false, they would have stopped seeking and/or treating with Anderson, immediately.

196.   Defendants' representations were made with the intent that Plaintiffs would rely on them, such that the U of M could therefore prevent Plaintiff from discovering they had a cause of action against Anderson.

197.   Plaintiffs did in fact rely on Defendants' representations, and thus treated with Anderson and continued to do so; had Plaintiffs known Defendants' representations were false, Plaintiffs would have never treated with Anderson.

198.   Defendants concealed this fraud through affirmative conduct designed and/or planned to prevent investigation and/or inquiry into the matter, and to prevent future discovery of fraud, as they:

      a.   Refused to terminate Anderson, thereby validating his conduct through his continued employment as a physican at one of the world's most esteemed institutions of higher education;

      b.   Affirmatively lied in written publications about Anderson "resigning" from UHS when, in truth, Anderson was fired, subsequently reinstated, and then demoted for his assaults on male students;

      c.   Hid Anderson's past, present, and future sexual abuse of young men from the public;

      d.   Ignored, refused, and ultimately failed to inquire, investigate, and/or question complaints made by students regarding Anderson's conduct, and thus failed to take action regarding Anderson's genital and anal

examiantions; and

e.  Did not create a policy to require adults, parents, chaperones, gaurdians, and/or caregivers to be present during physical and/or medical examinations of a minor or young student, by a treating physician.

199.  Defendants knew that Plaintiffs were, and Plaintiffs were in fact, particularly vulnerable to trusting, believing, and relying on Defendants' representations because:

a.  Plaintiffs were young, naïve men when abused by Anderson;

b.  Defendants' representations were made within a pervasive culture forged by statements from U of M representatives, which claimed Anderson's treatments were necessary; that Anderson was competent and ethical; and that Anderson was to be trusted, never questioned;

c.  Plaintiffs had no prior experience with legitimate, appropriately-performed treatments involving genital and/or anal examinations, making it impossible for Plaintiffs to identify Anderson's conduct as sexual assault, rather than a legitimate, appropriate examination as believed;

d.  Plaintiffs had no possible way of knowing the wrongfulness of Anderson's conduct because there were no parents, gaurdians, caregivers, and/or other medical professionals present during the genital and anal examinations to witness, question, and/or discoer that such procedures were indeed sexual assaults, and to thus inform Plaintiffs they had been sexually assaulted and had a cause of action;

e.  Based on Neuroscience, the prefrontal cortex of the brain, which is used to make decisions and distinguish right-from-wrong, is not fully developed until near age twenty-five (25), and thus allows teenagers to make better judgments as the cortex matures over time;

f.  Plaintiffs were intimidated by Anderson's notoriety and reputation and therefore believed his representations;

g.  Plaintiffs relied on U of M's Administration and trusted Anderson due to his notoriety;

h.  Plaintiffs, as young men with no knowledge or awareness of the civil justice system, had no reason to believe and lacked awareness of the

possibility they could sue, or had a possible cause of action for civil redress;

i.  Plaintiffs had no reason to believe or be aware they could sue, since Anderson and the U of M actively concealed allegations of abuse brought by other students, thereby making Plaintiffs unaware of these other claims and any possible actions to be had;

j.  Plaintiffs had never heard, by way of media, any allegations of sexual assault or misconduct levied against Anderson due to Anderson and U of M's concealment; and

k.  Plaintiffs were never told by Anderson himself that his genital and anal examinations were sexual in nature, unlike other victims of sexual abuse who are instructed such conduct against them is sexual, and is thus to be hidden and concealed from their parents and others.

200.  In accord with the above, Plaintiffs did not know, could not have reasonably known, and were reasonably unaware of any possible cause of against they had against Anderson and/or Defendants until on or about February 19, 2020.

201.  On or about February 19, 2020, Plaintiffs read an article discussing a complaint filed with the U of M Police Police Department by a student accusing Anderson of sexual assault.

202.  At this time, Plaintiffs became aware they too had been victimized by Anderson's sexual abuse, and that Defendants had directly and/or indirectly caused the abuse by knowing Anderson was a sexual predator, but chose not to stop, prevent, or deter the harm Anderson brought to students.

203.  Along with its affirmative, false representations, U of M officials, agents, and representatives failed to inform Plaintiffs they were being sexual abused by Anderson; and that Anderson, as a predator, had a history of committing sexual assault under the guise of 'medical treatment.'

204.   As a fiduciary to Plaintiffs, U of M had a duty to disclose such material information to Plaintiffs, and its failure to do so thus constitutes a fraudulent act.

205.   At all times relevant to this action, Defendants' employees, staff, managers, supervisors, and directors were indeed employees, agents, apparent agents, and/or servants of Defendants,and operated within their scope of employment; their Fraudulent Concealment is thus imputed to Defendants.

206.   Defendants' representations caused Plaintiffs' injuries relative to: (1) Anderson's repeated sexual assaults; (2) discovering that Anderson's 'treatment' was in fact sexual assault, learned on or about February 19, 2020; and (3) knowledge that Plaintiffs' university, to which they had devoted their lives through academics and athletics, had placed them in the hands of a known sexual predator, thus compromising their physical, mental, and emotion well-being.

207.   Plaintiffs incorporate by reference the paragraphs above and below regarding damages suffered; and attribute such to the U of M's responsibility for, and failure to address and/or stop, Anderson's sexual assaults; its awareness and responsibility for Anderson's fraudulent misrepresentations about his conduct/treatment; and its own fraudulent misrepresentations about the same, as well.

208.   Defendants have committed Fraudulent Concealment for the reasons set forth above and below.

## VII.   COUNTS AGAINST DEFENDANTS

### COUNT I:
### VIOLATION OF TITLE IX, EDUCATION AMENDMENTS ACT OF 1972
### 20 U.S.C. §1681(A), ET SEQ.[1]

209.   Plaintiffs reallege and incorporate by reference the allegations contained in

---

[1] To avoid excessive redundancy and for ease of reading by the Court, Plaintiffs have outlined their damages

Paragraphs 1-208 above as if stated herein.

210.   Title IX, 20 U.S.C. §1681(A) (hereafter "Title IX")  assures that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, *or be subjected to discrimination under any education program or activity* receiving Federal financial assistance …"

211.   Plaintiffs are "persons" under Title IX's statutory language and thus warranted its protections.

212.   The U of M receives Federal financial assistance for its "education program" and is, therefore, subject to Title IX's statutory provisions.

213.   As a school subject to Title IX, the U of M is required to investigate all matters of sexual violence including, but not limited to, sexual assault, abuse, and harassment, which extends over all academic programs belonging to the University, and any such conduct by its employees, students, and third-parties.

214.   Anderson's conduct (i.e. sexual assault) occurred within, and was carried out under, a U of M medical program designed to provide medical treatment to students and/or the public.

215.   Anderson's conduct toward Plaintiffs, specifically his nonconsensual, unnecessary, and inappropirate manipulation of Plaintiffs' genitals and anuses, constitutes sex discrimination under Title IX.

216.   Beginning in or around 1968, an "appropriate person" at the U of M had actual knowledge of Anderson's sexual assault, abuse, and/or molestation of young men.

217.   In particular, Defendants were notified of Anderson's sexual assault, abuse, and molestation by multiple young male students in or around 1968, and then again in 1975 and

1979.

218.   Upon Platinffs' information and belief, Defendants were also notified of Anderson's sexual assault, abuse, and molestation on multiple occasions after 1980, as well.

219.   Despite numerous complaints and notice of Anderson's sexual assault, abuse, and molestation, Defendants failed to inquire into, investigate, and/or stop Anderson's wrongful conduct as required by Title IX.

220.   After each complaint in 1968, 1975, and 1979, Anderson continued to sexually assault, abuse, and molest young male students, including but not limted to Plaintiffs.

221.   Accordingly, Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation perpetrated on its premises, by:

    a.   Failing to investigate and/or address allegations made by other victim's of Anderson's sexual assault, abuse, and molestation, as required by Title IX;

    b.   Failing to adequately investigate and/or address complaints regarding Anderson's sexual assault, abuse, and molestation, as required by Title IX.

    c.   Failing to execute corrective measures to prevent  Anderson from violating, molesting, and/or sexually abusing other students and individuals, including minor persons.

222.   Defendants acted with deliberate indifference, as their failure to respond to allegations of Anderson's sexual assault, abuse, and molestation was certainly unreasonable in light of the circumstances known to Defendant.

223.   Moreover, Defendants response, or lack thereof, was clearly unreasonable as Anderson continued his sexual assaults of students, third-parties, and *Plaintiffs* until he [Anderson] left the U of M in 2003.

224.   Defendants failure to promptly, appropriately, and necessarily investigate, respond to, and/or remedy Anderson's sexual assaults *after* notice of such conduct subjected Plaintiffs to

continued harassment and a sexually hostile environment, effectively denying Plaintiffs "participation" in, "benefits" from, and access to educational opportunites at the U of M, including Plaintiffs' medical care.

### COUNT II:
### CIVIL RIGHTS VIOLATION, 42 U.S.C. §1983
### *STATE CREATED DANGER*

225.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-224 above as if stated herein.

226.   At all relevant times, Defendants and Anderson—as Defendants' agent—were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

227.   According to United States Constitution, the Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of the law."

228.   Notwithstanding this Constitutional protection, Defendants *deliberately* subjected Plaintiffs to the care and/or treatment of Anderson—a known sexual predator—regardless of Defendants' knowledge that Anderson could and would cause damage to Plaintiffs and male other students by way of sexual assault.

229.   Defendants conduct and culpability is blatant and extreme.

230.   As a result of Defendants decision to not investigate the complaints beginning in 1968; to avoid corrective measures following Anderson's abuse; and to keep Anderson employed at the U of M, Plaintiffs became the foreseeable and certain victims, of foreseeable sexual assaults.

231.   These decisions made by Defendants deprived Plaintiffs of a safe campus, and

constitute affirmative actions intend to cause and/or increase the risk of harm done to Plaintiffs, and any physical and emotional injuries, as well.

232. Defendants have thus acted with willful disregard for Plaintiffs' safety, and have breached their fiduciary duty to protect students, like Plaintiff, from harm by placing Plaintiffs in the hands of a sexual predator, and thereby allowing Anderson's sexual assaults to occur.

233. Defendants therefore provided Anderson—a known sexual predator—the horrid opportunity to sexually assault Plaintiffs upon their failure to investigate complaints beginning in 1968, to take corrective measures following Anderson's abuse, and to employ Anderson notwithstanding knowledge of his wrongdoings.

## COUNT III:
## CIVIL RIGHTS VIOLATION, 42 U.S.C. §1983
### *RIGHT TO BODILY INTEGRITY*

234. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-233 above as if stated herein.

235. The Due Process Clause of the Fourteenth Amendment assures an individual the implied right to bodily integrity, including the right of the individual to be free of sexual assault, abuse, or molestation.

236. Plaintiffs enjoy those rights.

237. The acts committed by Anderson as alleged herein constitute a violation of these well-established, constitutionally protected rights of which a reasonable person in Defendants' position should have known.

238. At all relevant times, Defendants and Anderson—as Defendants' agent—were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

239.   Pursuant to custom, policy, and/or practice, Defendants had, and continue to have, the ultimate responsibility and authority to investigate complaints levied against their employees, agents, and representatives, whether raised by persons including, but not limited to, University students, visitors, faculty, staff, or other employees, agents, and/or representatives.

240.   Defendants failed to fulfill and execute this responsibility and authority, thus amounting to deliberate indifference.

241.   Additionally, Defendants were required to prevent, deter, and/or address all incidents regarding sexual assault, abuse, and/or molestation occurring on their campus or premises, as is established by the aforementioned Constitutional provisions and Title IX.

242.   Aside from those by Plaintiffs, Defendants failure to address the complaints of Anderson's many other patients led to an undetermined number of persons being victimized by Anderson's sexual assault, abuse, and molestation; such failures include Defendants' lack of response to complaints against Anderson beginning in 1968, 1975, and 1979, as well.

243.   Defendants ultimately failed to adequately investigate the aforementioned complaints brought by Plaintiffs *and* other similarly situated victims upon information of Anderson's sexual assaults, which includes Defendants' failure:

     a.   Not to place Anderson in a position of authority with access to a large population of young naïve males, who would be unlikely to complain about Anderson's conduct;

     b.   To Peform a thorough investigation into Anderson's improper conduct, upon receiving numerous complaints regarding the matter; and

     c.   To thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the coundct of Anderson.

244.   Having failed to respond to reports of Anderson's sexual assault, abuse, and

molestation in what is a clearly unreasonable manner, and thereby failing to prevent such conduct and harm to Plaintiffs and *other victims* done by Anderson, Defendants have acted with deliberate indifference and are thus liable to Plainitffs under 42 U.S.C. §1983.

245.   Moreover, Defendants tolerated, authorized, and/or permitted a policy, procedure, practice, or custom that allowed for the inadequate screening, insufficient supervision, and nonexistent discipline of Anderson, such that he [Anderson] was allowed to violate the rights of those such as Plaintiff with impunity.

246.   Therefore, because Defendants policies, practices, and customs contributed to Plaintiffs' harm by allowing Anderson's sexual assaults to continue, thereby depriving Plaintiffs of their rights secured by the United States Constitution, Defendants are further liable to Plaintiffs under 42 U.S.C. §1983, as well.

## COUNT IV:
## CIVIL RIGHTS VIOLATION, 42 U.S.C. §1983
### *FAILURE TO TRAIN AND SUPERVISE*

247.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-246 above as if stated herein.

248.   At all relevant times, Defendants and Anderson—as Defendants' agent—were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

249.   It is Defendants ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives, including faculty and staff such as Anderson, regarding duties owed toward students, colleagues, and visitors.

250.   These duties include specific responsibilities relative to identifying, reporting, and/or addressing sexual misconduct on Defendants campus or premises.

251.   Defendants failed to train and supervise their employees, agents, and/or representatives, including faculty and staff such as Anderson, regarding the following duties:

      a.   Percieve, report, and stop inappropriate sexual conduct on campus;

      b.   Provide ready, diligent, and ongoing supervision over students and other individuals, including Anderson;

      c.   Report suspected incidents of sexual assault, abuse, or molestation;

      d.   Establish and ensure the safety of all students, faculty, staff, and visitors to the U of M campus and/or premises;

      e.   Provide a safe environment for all students, faculty, staff, and visitors to U of M's premises, such that 'safe environment' *includes* one from from sexual harassment; and

      f.   Properly train faculty and staff to be aware of their individual duty to create and maintain a safe environment on the U of M campus and/or premises.

252.   Notwithstanding the importance of those duties, Defendants failed to adequately train faculty and staff, including athletic coaches, trainers, and medical personnel, on those duties—this leading to Defendants violation[s] of Plaintiffs' Constitutional and statutory rights.

253.   This failure to train is the direct result of Defendants deliberate indifference towards the well-being of its students, including their physical, mental, and emotional health.

254.   Defendants failure is closely related to, or the actual cause of Plaintiffs' injuries.

255.   Defendants have thus deprived Plaintiffs of their right to Due Process as provided by Fourteenth Amendment to the United States Consitution, and are thus in direct violation of 42 U.S.C. §1983 and liable to Plaintiffs, accordingly.

## COUNT V:
## VIOLATION OF ELLIOT-LARSEN CIVIL RIGHTS ACT, M.C.L. § 37.2101, ET SEQ.
### *SEX DISCRIMINATION*

256. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-255 above as if state herein.

257. Michigan's Elliot-Larsen Civil Rights Act (or "the Act") provides that "[t]he opportunity to obtain … the full and equal utilization of public accomodations, public service[s], and educational facilities without discrimination because of … sex … [is] a civil right."

258. The U of M is a place of "public accommodation, public service, and educational facili[ty]" as envisioned by the Act and the institutions to be covered.

259. Accordingly, Plaintiffs enjoyed the right to obtain and/or achieve the "full and equal utilization" of the U of M and any educational programs, facilities, and/or services it had to offer.

260. Anderson is a "person" as defined by the Act.

261. At all times relevant, Anderson was an agent of the U of M.

262. Plaintiffs' sex was *at least* one substantial factor that motivated Anderson to select Plaintiffs as victims of his sexual assault.

263. Therefore, had Plaintiffs been female, they would *not* have been the target of Anderson's sexual assault and abuse.

264. By allowing Anderson to access Plaintiffs vis-à-vis medical treatment as a psychian on the U of M campus, Defendants, through their agents, representatives, and employees, including Anderson, were predisposed to discriminated against Plaintiffs based on sex, and acted in accordance with that predisposition.

265. Similarly, by giving Anderson such access to Plaintiffs as their treating physician, Defendants, through their agents, representatives, and employees, including Anderson, treated Plaintiffs differently than similualry situated female students, to whom Anderson was *not* given

access by the U of M in the same unfettered manner to which he was given access to young male students on the unlawful; consideration of sex.

266.   Defendants thus subjected Plaintiffs—because of their sex—to physical, sexual conduct that had the purpose or effect of denying Plaintiffs the "full and equal utilization" of the U of M educational program, and denied them similar access to any privileges, accomodations, and/or services available to students at the U of M as well.

267.   Defendants have therefore deprived Plaintiffs of a civil right[s] defined and entrenched in the Act, and are thus liable to Plaintiffs accordingly.

<u>COUNT VI:</u>
**VIOLATION OF MICHIGAN CONSTITUTION, ARTICLE 1, § 17**
*SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY*

268.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-267 above as if stated herein.

269.   The Due Process Clause of the Michigan Constitution is coextensive with its federal counterpart, and thus provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law …"

270.   Accordingly, Michigan's Due Process Clause recognizes various substantive due process rights that protect the unenumerated, fundamental liberties of all citizens afforded by both federal and state constitutions.

271.   Through time, precedent has thus established that one such "liberty" protected by Michigan's Due Process Clause is an individual's right to bodily integrity free from unjustifiable government interference.

272.   This right to be free from state-occassioned damage to bodily integrity, and that to be in possession and control of one's own person, has been acknowledged by the United States

Supreme Court and the courts of Michigan as necessitating the most careful guard; and to be kept sacred, and free from the restraint and interference of others unless clear and unquestionable law suggests otherwise.

273.   Violating this right involves an egregious, nonconsensual entry into the body constituting an *exercise of power* without any legitimate government objective.

274.    Moreover, this violation must be so egregious and outrageous, that it can be fairly said to shock the contemporary conscience.

275.   Defendants, pursuant to official policies, practices, and customs, violated Plaintiffs right to bodily integrity by actions that include:

> a.  Failing to supervise, train, and/or educate Anderson, Anderson's managers, and/or Anderson's patients or their parents, so that in the absence of said supervision, training, and education, Anderson's sexual assault, abuse, and molestation could not be carried out;
>
> b.  Actively and purposefully concealing Anderson's horrid behavior; and
>
> c.  Failing to investigate student-complaints beginning as early as 1968, including the subsequent failure to take corrective actions in response to Anderson's abuse, thus allowing Anderson to remain as a physician at the U of M and have access to male students, despite knowledge that Anderson was a sexual predator who victimized such persons under the guise of medical treatment.

276.   Therefore, Defendants policies, practices, and customs, and their correlating failures, gave Anderson ease-of-access to male students serving as potential victims, thereby exposing such students, like Plaintiffs, to Anderson's abhorrent violations of bodily integrity so egregious, and so outrageous, that it shocks the conscience.

277.   The decisions and failures alleged herein—those which violated Plaintiffs' Due Process right[s]—were made by Defendants' high-level officials.

**COUNT VII:**
**VIOLATION OF MICHIGAN CONSTITUTION, ARTICLE 1, § 17**
***SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER***

278.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-277 above as if stated herein.

279.   The Michigan Constitution affords the individual, including Plaintiffs, a substantive Due Process right to avoid the risk of harm or danger created or increased by an affirmative act of the State.

280.   This right is therefore violated when the state: (1) engages in an affirmative act that either creates or increases the risk that a plaintiff will be exposed to a violent act by a third party; (2) that affirmative action does put a plaintiff in a special risk/danger, as opposed to a risk affecting the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

281.   Defendants actions, as an arm of the state/public state institution, constitute actions on behalf of the state.

282.   Defendants did create and increase the risk that Plaintiffs would be exposed to an act of violence by a third-party (i.e. Anderson) by conduct that includes: (1) permitting, condoing, and/or reassigning Anderson within the U of M medical program, such that Anderson was given access to young male patients, and thereafter sexually abused those patients with what he and Defendants considered 'medical treatment;' and (2) concealing, ignoring, and/or neglecting as product of policy, practice, or custom the knowledge that Anderson was contining his unlawful, horrid behavior.

283.   These affirmative acts created or increased the risk that Plaintiffs would be exposed to an act of violence or sexual assault by Anderson.

44

284.   This risk of violence or assault thus posed a special danger to Plaintiffs and similary situated individuals, because the state's conduct subjected this group—young males—to the risk of Anderson's abhorrent behavior, despite the state's knowledge that Anderson was manipulating the doctor-patient relationship to perpetrate sexual violence against this group of persons.

285.   Accordingly, Defendants knew or should have known that these affirmative acts specifically endangered Plaintiffs.

286.   Moreover, Defendants had established official policies, practices, and customs, that permitted, if not condoned and promoted Anderson's access to male students for the purpose of inappropriately groping their genetals or digitally penetrating the anus during medical treatment.

287.   Those official policies, practices, and customs violated Plaintiffs' right to be free from a state-created danger; the violation brought about by each of the following misconducts:

     a.   Failing to supervise, train, and/or educate Anderson, Anderson's managers, and/or Anderson's patients or their parents (if the victim was a minor at the time of assault), so that in the absence of said supervision, training, and education, Anderson's sexual assault, abuse, and molestation could not be carried out;

     b.   Actively and purposefully concealing Anderson's horrid behavior;

     c.   Failing to investigate student-complaints beginning as early as 1968, including the subsequent failure to take corrective actions in response to Anderson's abuse, thus allowing Anderson to remain as a physician at the U of M and have access to male students, despite knowledge that Anderson was a sexual predator who victimized such persons under the guise of medical treatment; and

     d.   Not terminating Anderson when it became known he was a sexual predator.

288.   Lastly, Defendants policies, practices, and customs permitted, condoned, and ultimately made possible the reassignment of Anderson, thereby giving him [Anderson] a continuing access to young male students and third-party individuals, thereby threatening such persons and Plaintiffs with invasions of bodily integrity so egregious and outrages they shock the conscience.

289.   Those decisions and failures above causing Defendants to shamefully violate Plaintiffs' Constitutional rights, and their freedom to avoid and be free of particularized, state-created risks, were made by Defendants' high-level officials.

**COUNT VIII:**
**GROSS NEGLIGENCE**

290.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-289 above as if stated herein.

291.   Defendants, owed to Plaintiffs a duty to use due care in ensuring their safety and that of similarly situated individuals, including safety—and freedom—from sexual assault, abuse, and/or molestation at the hands of Defendants' employees, representatives, and/or agents, including Anderson.

292.   However, Defendants breached this duty to Plaintiffs by failing to adequately supervise Anderson, even after notice of complaints regarding Anderson's nonconsensual, sexual touching and penetration performed during genital and anal examinations.

293.   Defendants conduct was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

294.   Similarly, Anderson, acting as Defendants' employee, agent, or representative, owed Plaintiffs the same duty of due care when providing Plaintiffs with medical treatment, as

created by the confidential doctor-patient relationship between Plaintiffs and himself.

295.   Anderson breached this duty to Plaintiffs by and through his sexual assaults, abuses, and molestations of Plaintiffs, all having been committed in his [Anderson's] scope of employment, agency, and/or representation of Defendants under the mask of 'medical treatment.'

296.   This conduct was so reckless as to demonstrate Anderson's substantial lack of concern for whether an injury would result to Plaintiffs.

297.   By the actions above, Defendants have shown a willfill disregard to take the necessary precautions once needed to ensure Plaintiffs' safety from Anderson; and such disregard for the substantial risk Anderson posed to Plaintiffs' safety as well.

298.   Defendants had thus breached their duties owed to Plaintiffs through the acts of gross negligence outlined above, each showing a reckless disregard for Plaintiffs' health, safety, and rights, and whether an injury would result therefrom, such that Defendants are liable to Plaintiffs accordingly.

<u>COUNT IX:</u>
**NEGLIGENCE**

299.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-298 above as if stated herein.

300.   Defendants, owed to Plaintiffs a duty of ordinary care in ensuring their safety and that of similarly situated individuals, including safety—and freedom—from sexual assault, abuse, and/or molestation at the hands of Defendants' employees, representatives, and/or agents, including Anderson.

301.   Defendants breached this duty of ordinary care owed to Plaintiffs by the following conduct including, but not limited to:

  a.   Failing to adequately train and supervise Anderson; and

b. Failing to propery investigate, address, and/or remedy Anderson's abhorrent behavior despite employees, agents, and/or representatives having notice in 1968, 1975, and 1979 by way of complaint[s] that Anderson was engaged in conduct of a sexual nature related to his predatory, sexual examinations of young males' genitals and anuses.

302. Accordingly, Defendants should have known, foreseen, and anticipated Anderson's sexual abuse of young male students beginning in 1968, and onward.

303. Similarly, Anderson, acting as Defendants' employee, agent, or representative, owed Plaintiffs the same duty of ordinary care when providing Plaintiffs medical treatment, as created by the confidential doctor-patient relationship between Plaintiffs and himself.

304. Anderson breached this duty to Plaintiffs with each sexual assault, abuse, or molestation of Plaintiff[s], each incident being committed in his [Anderson's] scope of employment, agency, and/or representation of Defendants under the mask of 'medical treatment.'

**COUNT X:**
**VICARIOUS LIABILITY**

305. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-304 above as if stated herein.

306. The doctrine of vicarious liability is based on theory of indirect responsibility, and creates by operation of law an agency-relationship between the principal and its agent, such that the principal is held responsible for what its agent has done.

307. In circumstances of employer-employee relationships, vicarious liability implies that an employer is responsible for the wrongs of his employee committed in the scope of employment.

308. From approximately 1966 to 2003, Defendants employed and/or held out

Anderson as their employee, agent, and/or representative.

309.   Accordingly, Defendants, as Anderson's principal/employer, had the right, duty, and/or ability to supervise Anderson's medical exams—and Anderson himself—so as to ensure the safety and well-being of Anderson's patients.

310.   However, Defendants too had an obvious and direct financial interest in allowing Anderson to provide medical care for the U of M and to prevent these allegations from tarnishing the school's reputation.

311.   Defendants, as Anderson's principal/employer, are vicariously liable for Anderson's sexual misconducts alleged in the preceding Paragraphs, as such were performed during and in furtherance of his employment, agency, and/or representation of Defendants, and were subject to Defendants' right, ability, or duty of control through an lacking system of supervision.

## COUNT XI:
## EXPRESS/IMPLIED AGENCY

312.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-311 above as if stated herein.

313.   Under agency law, a principal may be liable for and/or bound by the acts of its agent if it represents to a third-party, either intentionally or negligently, that the agent is working on the its behalf, with its [the principal's] authority, and the third-party reasonably relies on such representations.[2]

314.   An "agent," therefore, is someone authorized by actual or apparent authority to act on the principal's behalf.

---

[2] See Deschamps v. Bridgestone Americas, Inc. Salaried Employees Ret. Plan, 840 F.3d 267, 279 (6th Cir. 2016); Chesterfield Exch., LLC v. Sportsman's Warehouse, Inc., 572 F. Supp. 2d 856, 866 (E.D. Mich. 2008).

315.   Defendants intentionally and/or negligently represented to Plaintiffs that Anderson was their employee, agent, and/or representative, while simultaneously possessing the right to control Anderson's conduct by way of the principal-agent relationship.

316.   Based on Defendants representations, Plaitiffs reasonably believed that Anderson was acting as an employee, agent, and/or representative of Defendants, the principal/employer, and, therefore, had the authority to act on Defendants behalf and with Defendants' authority.

317.   Because of these reliances, Plaintiffs were injured as a result of Anderson's sexual assault, abuse, and molestation as described in the Paragraphs above, each incident having occurred in the course of, and under apparent authorization by, Defendants as Anderson's principal/employer, on whom Plaintiffs relied to provide them with medical professionals capable of reasonable skill and care.

## COUNT XII:
## NEGLIGENT SUPERVISION

318.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-317 above as if stated herein.

319.   Employers generally must take greater care to supervise employees whose *past or current behavior* suggests the employee poses a greater risk of harm to others.[3]

320.   Defendants owed a duty to Plaintiffs and other similarly situated males to reasonably supervise Anderson, their employee, agent, and/or representative, during his employment, agency, and/or representation, and while Anderson interacted with, or provided medical treatment to, Plaintiffs and other young male students.

321.   Defendants owed this duty as it was foreseeable that Anderson posed a risk to

---

[3] *See* Restatement of Employment Law § 4.04, comment d (2015).

Plaintiffs and other young males, as suggested by Defendants' firing, reinstating, and demoting Anderson in 1980, at which time he had committed predatory acts **against young male patients reported to the university**.

322.   Accordingly, Defendants, by and through their employees, agents, managers, and/or assigns, knew or should reasonably have known that Anderson's prior conduct (i.e. his abhorrent, sexual behavior) rendered Anderson an unfit employee, agent, and/or representative requiring supervision given his threat to Plaintiffs and young males alike.

323.   Defendants, by allowing Anderson's horrid sexual assaults to occur and/or continue, breached their duty to reasonably supervise Anderson, and through this breach allowed not permitted Anderson's acts, but allowed him to manipulate his position of power and authority over young male students.

324.   Anderson's sexual abuse occurred on the U of M campus and/or premises, in the course/scope of Anderson's employment, agency, and/or representation of Defendants.

325.   In combination of the above, Defendants ultimately tolerated, permitted, and/or authorized a policy, practice, procedure, or custom providing insufficient supervision of its employees, agents, and/or representatives, including Anderson, and failed to adequately screen such individuals pursuant to this policy, practice, etc., thus allowing those like Anderson to violate the rights of others, like Plaintiffs, with impunity.

### COUNT XIII:
### NEGLIGENT FAILURE TO WARN OR PROTECT

326.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-325 above as if stated herein.

327.   Beginning in or around 1968, Defendants had direct and/or constructive

knowledge of Anderson's abhorrent, dangerous conduct as reported in complaints to the university.

328.   Defendants therefore knew or should have known that Anderson had committed sexual assault, abuse, and/or molestation of Plaintiffs and other young male patients, or was continuing to engage in such conduct.

329.   Moreover, and with knowledge of Anderson's conduct, Defendants knew or should have known that Anderson posed a risk of harm to Plaintiffs and other similarly situated males.

330.   Accordingly, Defendants owred a duty to warn and/or protect Plaintiffs and other individuals against the risk of injury Anderson posed.

331.   Defendants further owed a duty to disclose this knowledge and information of Anderson's conduct and/or risk pursuant to the trusting, fiduciary doctor-patient relationship that existed between Anderson as Defendants' employee, agent, and/or representative, and Plaintiffs.

332.   Defendants breached this duty by failing to warn and/or protect Plaintiffs from Anderson, which includes but is not limited to:

a.   Failing to respond to allegations of Anderson's sexual assault, abuse, and molestation;

b.   Failing to act on evidence of Anderson's sexual assault, abuse, and molestation; and

c.   Failing to investigate, adjudicated, and/or terminate Anderson's employment with the U of M prior to his treatment of Plaintiffs and other similarly situated individuals.

333.   Furthermore, Defendants failed to adequately screen, counsel, and/or discipline Anderson for any and all physical and/or mental conditions rendering him unfit to execute his duties and responsibilities as a physician at a university, resulting in violations of Plaintiffs'

rights.

334.   Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Anderson's sexual assault, abuse, and molestation.

## COUNT XIV:
## NEGLIGENT FAILURE TO TRAIN OR EDUCATE

335.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-334 above as if stated herein.

336.   Defendants owed to Plaintiffs and other young men/minors the duty to implement reasonable protective measures intended to protect Plaintiffs and these persons from Anderson's sexual assault, abuse, and/or molestations.

337.   Defendants, however, failed to take such reasonable protective steps, such as failing to properly train and/or educate Plaintiffs and other similarly situated young males to avoid this risk of harm.

338.   Among other things, Defendants failed to implement reasonable safety measures to:

      a.   Prevent acts of sexual assault, abuse, and/or molestation;

      b.   Avoid Anderson's unsupervised contact with Plaintiffs and other young males, and positions that that allowed Anderson to victimize these persons;

      c.   Educate students, like Plaintiffs, on reporting and/or preventing unwanted touching, penetration, and otherwise sexual conduct/advances from authority figures, considering the U of M knowingly allowed Anderson, its employee, agent, and/or representative and a sexual predator, contact with these students; and

      d.   Training and/or educating U of M employees to recognize and be aware of improper touching, considering the U of M knowingly allowed Anderson,

its employee, agent, and/or representative and a sexual predator, contact with young male students.

## COUNT XV:
## NEGLIGENT RETENTION

339.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragaraphs 1-338 above as if stated herein.

340.   Defendants owed a duty to Plaintiffs and other similarly situated males to exercise due care whenever hiring, retaining, screening, checking, regulating, monitoring, credentialing, and/or supervising its employees, agents, and/or representatives.

341.   Defendants breached this duty, and were negligent in retaining Anderson as an employee, agent, and/or representative of the U of M after failing to adequately investigate, report, and/or address complaints regarding his sexual assaults, abuse, and molestations of which Defendants knew, or reasonably should have known.

342.   Moreover, Defendants were negligent in retaining Anderson after having discovered, or after having the reasonable opportunity *to* discover, Anderson's abhorrent conduct as an indication of his sexual, criminal propensities.

343.   Had Defendants terminated Anderson's employment, Plaintiffs injuries would not have occurred.

344.   Defendants' failure to act with due care allowed Anderson access to Plaintiffs and other similarly situated individuals, and thus allowed for Anderson's sexual assault, abuse, and molestation of Plaintiffs and these persons.

345.   Accordingly, Defendants' neglent hiring, retaining, screening, checking, regulating, monitoring, credentialing, and/or supervising of its employees, agents, and/or representatives, including Anderson, created a foreseeable risk of harm to Plaintiffs and other

young men.

## COUNT XVI:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

346.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-345 above as if stated herein.

347.   A defendant can be liable for the intentional infliction of emotional distress for extreme and outrageous conduct intended to cause or which recklessly causes a plaintiff to experience severe emotional distress.[4]

348.   This "extreme and outrageous conduct" is any act that defies the bounds of decency and is utterly intolerable by a civilized society,[5] thereby causing "emotional distress" so severe that no reasonable man could be expected to endure it.[6]

349.   Defendants, by and through the allegations above, allowed Anderson to hold employment that allowed his acces to and sexual assault of Plainitffs and other young men, notwithstanding Defendants' knowledge of Anderson's conduct as deduced from student-complaints beginning in 1968.

350.   This type of conduct is extreme and outrageous.

351.   Moreover, Defendants actively touted Anderson as worth of high esteem and acclaim, thereby encouraging Plaintiffs and other young males to trust Anderson, and to refrain from questioning his medical treatments or motives, such as genital and anal examinations.

352.   Accordingly, a reasonable person would not expect Defendants' tolerance, permission, and/or authorization of Anderson's sexual assault, abuse, and/or molestation, nor Defendants' admiration of Anderson in lieu of his horrid sexual propensities.

---

[4] *Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993)(quoting *Dickerson v. Nichols*, 161 Mich. App. 103, 107-08, 409 N.W.2d 741 (1987)).
[5] *Ross v. Burns*, 612 F.2d 271, 273 (6th Cir. 1980)(quoting Restatement (Second) of Torts § 46, comment d (1948));
[6] Restatement (Second) of Torts § 46, comment j (1965).

353.   Furthermore, a reasonable person would not expect Defendants to neglect, forego, and/or find themselves incapable of supervising Anderson and/or preventing his sexual misconducts against Plaintiffs and other similar situated males, as did occur.

354.   Defendants conduct was therefore intentionally designed or recklessly executed to allow for Anderson's sexual abuse, resulting in Plaintiffs' severe emotional distress.

## COUNT XVII:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

355.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-354 above as if stated herein.

356.   Defendants acted with negligence by providing Anderson with employment that gave him access, opportunity, and the ultimately ability to sexually assault, abuse, and/or molest Plaintiffs and other similarly situated young men.

357.   Defendants' negligence was the proximate cause of Anderson's sexual assault, abuse, and/or molestation of Plaintiffs.

358.   Plaintiffs have thus suffered damages directly related to Anderson's sexual assault[s], as well as damages related to discovering they were and are victims of Anderson's sexual misconduct tolerated, permitted, and/or authorized by their alma mater, the U of M.

359.   The combination of these events, including Defendants' own actions and Anderson's sexual assaults, naturally and probably resulted in Plaintiffs' emotional distress.

360.   The combination of these events, including Defendants' own actions and Anderson's sexual assaults, did in fact result in Plaintiffs' emotional distress.

## COUNT XVIII:
## FRAUD AND MISREPRESENTATION

361.   Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1-359 above as if stated herein.

362.   Between 1968 and 2003, Defendants represented to Plaintiffs and the public that Anderson was a competent, ethical, and safe physician employed by the U of M.

363.   Defendants further represented that Anderson, by and through his competence and ethics, was a trustworthy physician of high morals, and that Plaintiffs need not worry about Anderson doing them any harm.

364.   Defendants' representations were false.

365.   Between 1968 and 1979, Defendants received multiple compaints regarding Anderson's sexual assaults committed on male patients during genital and anal examinations.

366.   Defendants thus had knowledge that Anderson was commiting and continuing to commit sexual assault, abuse, and molestation against Plaintiffs and other similarly situated individuals.

367.   Although Defendants had knowledge of Anderson's conduct, they failed to investigate, remedy, or address it in any way, but instead held Anderson out as a competent and safe physician.

368.   In fact, Defendants misrepresented Anderson's firing as UHS Director in 1979 as a "resignation" via written/oral communications to the U of M community and public; and yet, Defendants had knowledge that Anderson was instead fired, reinstated, and demoted as a result of his sexual, predatory conduct toward Plaintiffs and other college males alike.

369.   Defendants made these represetations with the intent that Plaintiffs and other young college males rely on them when seeking treatment from Anderson.

370.   Plaintiffs did in fact rely on Defendants fraudulent assertions and continued to seek

treatment from Anderson, despite Defendants' first-hand knowledge of the risk posed to Plaintiffs because of Anderson's criminal sexual propensities.

371.   Plaintiffs were therefore subjected to Anderson's sexual assault, abuse, and/or molestation as a result of Defendants' fraudulent misrepresentations regarding Anderson's fitness as a medical professional.

## VIII.   PLAINTIFFS' DAMAGES

372.   On or around February 19, 2020, news outlets reported that multiple former students from the U of M had come forward with complaints of sexual abuse committed by a former university staff member.

373.   That staff member was Dr. Robert Anderson, accused of committing multiple sexual assaults while treating students at the U of M or its UHS, which Anderson guised as routine medical treatments and/or examinations.

374.   At this time Plaintiffs learned that Anderson—who had treated them in the past— was a serial sexual predator.

375.   Pointedly, Plaintiffs' damages arise from two distinct and exclusive harms:

    a.   Plaintiffs' revelation that Anderson's prior treatment, which involved what were initially perceived as bizarre, strange acts, were in fact criminal sexual conduct[s] motivated by Anderson's abhorrent intent to assault, abuse, and/or molest students, thereby making Plaintiffs one of Anderson's innocent victims; and

    b.   Plaintiffs' revelation that the U of M, to whom Plaintiffs had given their transformative years and allowed to become a part of their lives, had lead them into the hands of a sexual predator, whom the U of M twistedly guised as a competent, concerned physican worthy of continued treatment and care.

376.   Since these revelations, Plaintiffs have experienced and/or continue to experience

shame, shock, humiliation, embarrassment, loss of self-esteem, disgrace, and emotional distress (including the physical manifestations thereof).

377. Moreover, discovering the harm Anderson committed disturbed and/or continues to disturb Plaintiffs' sense of self-worth and identify, leading to Plaintiffs' anxiety, depression, and emotional suffering.

378. Additional harms and/or damages to Plaintiffs include:

    a. The feeling of betrayal upon learning the U of M chose not to protect them from Anderson's known, anticipated abuse;

    b. The feeling of betrayal upon learning the U of M lead them to Anderson's care, notwithstanding Defendants' knowledge that Anderson was a predator;

    c. The worries and anxieties prompted by Plaintiffs' fear that family or friends may learn Plaintiffs too are victim's of Anderson's horrid behavior;

    d. Anxieties regarding the possibility of future and/or continued interactions with the U of M following its storied betrayalof Plaintiffs; and

    e. Anxieties associated with Plaintiffs' uncertainty as to how these harms will manifest themselves in Plaintiffs' immediate and distant future.

379. Plaintiffs' revelations have forced them to relive the trauma of what they now know to be Anderson's sexual assaults, thereby damaging Plaintiffs' emotional and psycholigcal health upon this understanding that the U of M knowingly exposed them *and others* to Anderson's abuse during his employment from 1966 to 2003.

380. As a direct and/or proximate cause of Defendants' conduct, Plaintiffs have suffered, and will continue to suffer, from the discomfort, shock, embarrassment, humiliation, grief, disgrace, loss of self-esteem, pain of mind and body, and emotional distress (and the physical maniffestations thereof) associated with Anderson's sexual assault, abuse, and/or

molestation, as may appear throughout discovery and trial.

381.   These injuries to Plaintiff amount to a series of irreparable harms commonly suffered by young men when sexually assaulted, abused, and/or molestated by a trusted authority figure, such as a doctor.

382.   Symptoms of male sexual abuse deriving from those injuries include, but are not limited to, sexual dysfunction; the inability to engage in close relationships with others; confusion about one's sexual identity; and embarrassment and depression, all of which can last for decades.[7]

383.   The above injuries and symptoms are *especially harmful* when the perpetrator responsible is known and trusted by the victim.[8]

384.   When sexual abuse is perpetrated by a medical provider, patients often fail to understand the abuse occurred in relation to the provider's access to, trust, and authority over the victim, thereby causing common injuries of emotional distress, humiliation, and the inability to trust providers or the medical field, generally.[9]

385.   Accordingly, and as a result of some or all of the actions and/or inactions of Defendants described above, Plaintiffs have, and will continue to suffer, from irreparable harms caused by Defendants' failed handling of Anderson's sexual misconducts.

**WHEREFORE**, Plaintiffs JOHN DOE ALF-1, JOHN DOE ALF-2, and JOHN DOE ALF-3, JOHN DOE ALF-4, and JOHN DOE ALF-5, by and through their attorneys,

---

[7] *See Male Victims of Male Sexaul Assault: a Review of Psychological Consequences and Treatment* (Sexual and Relationship Therapy, August 2001); *Effects of Sexual Assaults on Men: Physical, Mental and Sexual Consequences* (International Journal of Men's Health, Vol. 6, No. 1, Spring 2007, pp. 22-35).
[8] *See Integration of Sexual Trauma in a Religious Narrative: Transformation, Resolution and Growth among Contemplative Nuns* (Transcult Psychiatry, Feb 2013 – 50 (1: 24-24); *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond* (EVAW's OnLine Training Institute, May 2019, p. 34).
[9] *See Above All, Do No Harm: Abuse of Power by Health Care Professionals*, by Kathleen S. Lundgren, Wanda S. Needleman, Janet W. Wohlberg (2004), available at https://www.therapyabuse.org/p2abuse-of-power.htm.

Andrew P. Abood and the ABOOD LAW FIRM, request that this Honrable Court and finder-of-fact enter judgment in Plaintiffs' favor against Defendants on all counts and claims above, in an amount consistent with the proofs put on at trial and with an award against Defendants for all damages arising out of law, equity, and fact where applicable, including but not limited to:

    a.  COMPENSATORY DAMAGES in an amount deemed fair and just by the Court and fact-finder under the circumstances, including but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, loss of social pleasure and enjoyment, and the repeated violations of Plaintiffs' Constitutional, Federal, and State rights, as well as other damages to be proved;

    b.  PUNITIVE AND/OR EXEMPLARY DAMAGES in an amount deemed fair and just by the Court and trier of fact;

    c.  REASONABLE ATTORNEYS FEES, INTERESTS, AND COSTS; and

    d.  OTHER DECLARATORY, EQUITABLE, AND/OR INJUNCTIVE RELIEF including, but not limited to, Defendants' institutional reform implemented by taking measures that ensure Defendants' accountability to provide for the safety and protection of young male students and individuals, as this Court finds equitable and just.

Respectfully submitted,

**/s/Andrew P. Abood**

Dated: October 9, 2020

Andrew P. Abood (P43366)
Jeffrey Lance Abood (P72607)
**ABOOD LAW FIRM**
Attorneys for Plaintiffs,
246 E. Saginaw, St., Suite #100,
East Lansing, MI, 48823,
Phone: 517-332-5900
Fax: 517-332-0700
Email: andrew@aboodlaw.com

**JURY DEMAND**

Plaintiffs, by and through their attorneys, Andrew P. Abood and the ABOOD LAW FIRM, hereby demand a trial by jury on all claims set forth above.

Respectfully submitted,

/s/**Andrew P. Abood**

Dated: October 9, 2020                     Andrew P. Abood (P43366)
Jeffrey Lance Abood (P72607)
**ABOOD LAW FIRM**
Attorneys for Plaintiffs,
246 E. Saginaw, St., Suite #100,
East Lansing, MI, 48823,
Phone: 517-332-5900
Fax: 517-332-0700
Email: andrew@aboodlaw.com